Filed 7/1/26

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEVEN RICHARD CASTRO,<br><br>    Defendant and Appellant. | D085983<br><br><br>(Super. Ct. No. FWV24001812) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Shannon L. Faherty, Michael A. Knish, Judges.  Reversed with directions.

Annie Fraser, under the appointment by the Court of Appeal, for Defendant and Appellant.

Ron Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, A. Natasha Cortina and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

In *Mitchell v. Wisconsin* (2019) 588 U.S. 840 (*Mitchell*), a plurality opinion from the United States Supreme Court considered the situation where a police officer comes upon the scene of an automobile accident and discovers that one of the drivers suspected of driving under the influence of alcohol (DUI) is unconscious. "[U]nder those circumstances," the opinion observed, "the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant." (*Id.* at p. 843; see *id.* at pp. 843–844.) Accordingly, *Mitchell* articulated a "general rule" that exigent circumstances will "almost always" permit a blood test without a warrant. (*Id.* at p. 843.)

In *People v. Alvarez* (2023) 98 Cal.App.5th 531 (*Alvarez*), this court considered the *Mitchell* general rule in the context of another DUI case that involved an unconscious suspect-driver. In *Alvarez*, however, the police officer did not encounter the suspect-driver at the collision scene, but rather at the hospital sometime after the accident. We held that the record failed to support a finding of exigency sufficient to excuse the officer's failure to obtain a blood draw warrant. (*Alvarez*, at pp. 545–546.) In this case, also involving an unconscious suspect-driver first contacted by police at the hospital several hours after the accident, we employ similar reasoning to reach a similar conclusion.

## FACTUAL AND PROCEDURAL BACKGROUND

Around midnight, defendant Steven Richard Castro crashed his car into a vehicle parked in a residential neighborhood in Bloomington, a community in San Bernardino County. The collision injured the occupant of the parked vehicle, a rideshare driver waiting for a customer. Hearing

the crash, neighbors came outside and restrained Castro, who attempted to leave the scene.

Shortly thereafter, the California Highway Patrol (CHP) broadcast a request for available units to respond to the scene of the crash. Eventually, several CHP officers including Sergeant Bernardino arrived at the scene. The sergeant later contacted CHP Officer Robert Pope—who was then at the Arrowhead Regional Medical Center working on an unrelated matter—to alert him that the driver suspected of causing the Bloomington crash (Castro) was being transported by ambulance to the medical center to receive treatment for his injuries.[1]

During roughly the same time period that Castro was being transported, Sergeant Bernardino also traveled to the medical center. On his arrival he spoke with Officer Pope, telling him about the crash. Bernardino added that Castro had been aggressive with emergency personnel at the scene and "had to be strapped down to the gurney inside of the ambulance."

At approximately 2:30 a.m., Officer Pope went to see Castro in the emergency room (ER). Castro was sedated and unresponsive. Pope noted that a "distinct odor of an alcoholic beverage" emanated from his body. Pope learned from ER personnel that they sedated Castro "due to him being aggressive with them, yelling at them, and trying to fight them." They said he would be unresponsive for another two to three hours.

_____

[1] The record does not indicate the exact nature of the injuries, although they appear to have been minor.

Officer Pope spoke by phone with one of the Bloomington neighbors who witnessed the aftermath of the crash. He also talked with the rideshare driver-victim, who was being treated at a different hospital. A little over an hour later, at approximately 3:45 a.m., Pope made the decision to arrest Castro on suspicion of driving under the influence of alcohol and causing bodily injury. (See Veh. Code, § 23153.) He said this decision was based on three factors: (1) the odor of an alcoholic beverage; (2) Castro's aggressive behavior with emergency personnel; and (3) the circumstances of the crash, particularly the fact that Castro collided with a parked car.

At that point, Officer Pope called for a phlebotomist to conduct a blood draw to determine Castro's blood alcohol content (BAC).[2] He made no attempt to request a warrant authorizing him to obtain blood from an unconscious arrestee. Asked why he did not seek a warrant, Pope said it was "because due to implied consent, I do not need to, if the person is unable to give consent due to him being unconscious or sedated." No evidence was presented as to how long it would have taken to obtain a warrant.

Officer Pope was initially told that the phlebotomist would arrive in approximately five minutes, but the estimate turned out to be somewhat optimistic because she did not get to the hospital until approximately 4:00 a.m. and Castro's blood was not actually drawn until 4:25 a.m. There was no evidence as to what, if anything, Officer Pope was doing between

---

[2]    Officer Pope testified he called "LEMS" to arrange for the blood draw, but did not further explain the acronym. We infer from context that it is an organization in San Bernardino County that employs phlebotomists and contracts with law enforcement agencies to conduct blood draws.

4

3:45 and 4:25 a.m. while he waited.[3]  The results of the blood test showed a BAC of 0.193.

Castro brought a motion to suppress evidence pursuant to Penal Code section 1538.5 in conjunction with his preliminary hearing, seeking to exclude the blood test results.  Relying on the United States Supreme Court decision in *Mitchell, supra*, 588 U.S. 840, the magistrate concluded that exigent circumstances excused Officer Pope from requesting a warrant to authorize the blood draw.  She explained her reasoning:  "Every minute that Officer Pope was there [at the hospital], he was not out on the freeways.  So in my view, I do think that it was appropriate and justified in order to take blood without a warrant."

Castro renewed his request to suppress the BAC evidence as part of a pretrial motion pursuant to Penal Code section 995.  (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.)  But based on "the whole totality of what was happening, the chaos, … the demands on the Officer, and the fact that Mr. Castro was sedated, was unconscious, there had been an accident," the court found that "the Officers['] failure to get a warrant does not … violate Constitutional rights."  Castro then entered a plea of no contest to a violation of Vehicle Code section 23153, subdivision (a).  This appeal followed.  (See Pen. Code, § 1538.5, subd. (m).)

---

[3]     Defense counsel attempted to inquire whether Pope was engaged in "other type of activity" while he waited for the phlebotomist to arrive.  Pope indicated he did not understand the question.  Counsel attempted to clarify, asking whether Pope was "doing other investigations" or "[w]orking on other assignments."  The prosecutor objected on relevancy grounds, and the objection was sustained.

## DISCUSSION

No one disputes that a forcible blood draw, as occurred in this case, implicates the protections of the Fourth Amendment to the United States Constitution. (U.S. Const., 4th Amend.; see *Birchfield v. North Dakota* (2016) 579 U.S. 438, 455 (*Birchfield*) ["taking of a blood sample … is a search"].) Under general Fourth Amendment principles, a warrantless search or seizure is presumptively unreasonable unless the government demonstrates the applicability of a recognized exception to the warrant requirement. (*People v. Laiwa* (1983) 34 Cal.3d 711, 725.) Applied in the context of DUI investigations, it has been clear at least since the United States Supreme Court decision in *Missouri v. McNeely* (2013) 569 U.S. 141 (*McNeely*) that absent an applicable exception, "the Fourth Amendment requires a warrant for a blood draw." (*Alvarez, supra*, 98 Cal.App.5th at p. 546.)

One recognized exception to the warrant requirement is when exigent circumstances make it impossible or impractical for law enforcement officers to take the time that would be required to obtain a warrant. (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1041.) And it has long been accepted that the evanescent nature of alcohol in the blood as evidence of a DUI violation can contribute to a finding of an emergency that would justify a warrantless blood draw. (See, e.g., *Schmerber v. California* (1966) 384 U.S. 757, 770 ["the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system"].) In *McNeely*, the Court again acknowledged this physiological reality (*McNeely, supra*, 569 U.S. at p. 152), but nonetheless rejected the government's argument that it justified a per se exigent circumstances exception to the warrant requirement: "In short, while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, … it does not do so

6

categorically.  Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."  (*Id.* at p. 156; see also *id.* at p. 152 [refusing to "depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State"].)

Three years after *McNeely*, the United States Supreme Court was asked to create a different automatic exception to the warrant requirement for DUI breath tests and blood draws based on the search-incident-to-arrest concept.  (*Birchfield v. North Dakota* (2016) 579 U.S. 438.)  The Court accepted the argument as to breath tests, but balked at extending this new rule to blood tests:  "Blood tests are significantly more intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test.  Respondents have offered no satisfactory justification for demanding the more intrusive alternative without a warrant."  (*Id.* at p. 474.)  Significantly for our purposes, the Court commented on the situation we confront of an unconscious suspect-driver, noting that it will generally require a warrant:

> "It is true that a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is needed to take a breath test due to profound intoxication or injuries. But we have no reason to believe that such situations are common in drunk-driving arrests, and when they arise, the police may apply for a warrant if need be." (*Id.* at p. 475.)

Another three years later, the United States Supreme Court once again considered the exigent circumstances exception in the context of a DUI blood draw, focusing specifically on the situation where the suspect-driver is unconscious.  (*Mitchell, supra*, 588 U.S. 840.)  Although the Court's plurality

7

opinion commented that "the exigent-circumstances rule [will] *almost* always permit[] a blood test without a warrant" in this situation (*id.* at p. 843, italics added), it does not do so automatically or without further inquiry. Rather, "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application." (*Id.* at p. 854; see also *People v. Nault* (2021) 72 Cal.App.5th 1144, 1148.) With respect to the second factor, *Mitchell* acknowledged that the defendant should be given the opportunity to show either (a) "his blood would not have been drawn if police had not been seeking BAC information," or (b) "police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." (*Mitchell*, at p. 857.)

Our decision in *Alvarez, supra*, 98 Cal.App.5th 531 also involved a blood draw from an unconscious suspect-driver and makes clear that while many such situations will involve exigent circumstances, not every case will excuse the failure to obtain a warrant. In *Alvarez*, police arrived at the scene of a two-car collision and discovered the deceased victim, a 15-year-old minor from the same vehicle, and a third person—the defendant—who admitted to driving the second vehicle. The defendant seemed shaken but uninjured, and did not show overt symptoms of intoxication. (*Id.* at p. 537.) While police continued their investigation at the scene, the defendant and the minor were transported to a local hospital by emergency medical personnel. (*Ibid.*)

One of the officers, Officer Yost, finished his work at the accident scene and drove to the hospital, where he first contacted the defendant 75 minutes after the accident and smelled the odor of an alcoholic beverage emanating from him. (*Alvarez, supra*, 98 Cal.App.5th at p. 538.) About 15 minutes later, Yost used a preliminary alcohol screening (PAS) device in an attempt

8

to obtain an analyzable breath sample. The defendant was unable or unwilling to provide a breath sample sufficient for the PAS device to operate automatically. But Yost was able to capture two "manual trap" samples, which he testified would typically yield a lower result than the automatic method. The manual samples measured a BAC of 0.037 and 0.039. (*Ibid.*)

At that point, Officer Yost decided to request a blood sample, but the defendant had become unresponsive.[4] So Yost called to request a forensic blood draw, making no attempt to obtain a warrant. (*Alvarez, supra*, 98 Cal.App.5th at pp. 539, 541.) He later testified he was concerned that if he took the time to obtain a warrant, hospital personnel might take the defendant away for treatment in a different part of the hospital. (*Id.* at pp. 540–541.) The phlebotomist arrived in about 30 minutes and drew the blood while the defendant remained unresponsive. The test revealed a BAC of 0.05. (*Id.* at p. 539.)

Relying primarily on *Mitchell,* the People argued that the circumstances in *Alvarez* demonstrated sufficient exigency to excuse the officer's failure to seek a warrant before the blood draw. We disagreed.

We began our analysis of the exigency issue by observing that *Mitchell* "did not reverse *McNeely*'s rule that officers need a blood-draw warrant if one is practical to obtain." (*Alvarez, supra*, 98 Cal.App.5th at p. 544.) We noted that *Mitchell*'s discussion of exigency must be understood in the context of the facts of that case—the more typical situation where the suspect-driver is injured in the accident and ultimately loses consciousness (at the scene or on

---

[4] The defendant was lying on a hospital bed with his eyes closed. He did not respond to the officer, hospital personnel, or anyone else. The officer testified he "could not tell whether [the defendant] was asleep, unconscious, or just ignoring him." (*Alvarez, supra*, 98 Cal.App.5th at p. 539.)

the way to the hospital) before police can conduct a normal investigation. As the *Mitchell* court observed, officers at the accident scene may have insufficient time or resources to attend to the injured, control affected traffic, investigate the cause of the accident, and obtain a warrant. (*Mitchell, supra*, 588 U.S. at p. 856.) In addition, necessary medical treatment for the suspect-driver might interfere with an evidentiary blood draw. (*Id.* at p. 855.)

In *Alvarez*, however, as is true in this case, the defendant's unresponsiveness "did not motivate his transport to the hospital." (*Alvarez, supra*, 98 Cal.App.5th at p. 545.) Rather, he was taken to a medical facility more as a precaution. (*Id.* at p. 544.) The defendant in *Alvarez* appears to have become unresponsive gradually over a 90 minute time period after the accident. (*Id.* at p. 545.) There was nothing in the record to indicate he required any emergency treatment as a result. (*Id.* at p. 539.) In this case, Castro's unresponsiveness was apparently unrelated to any physical effects of the collision. Instead, he became combative with emergency room personnel at the hospital and had to be sedated hours after the accident. Again, he received no emergency treatment.

Our focus in *Alvarez* on whether the defendant's unconsciousness motivated transport to the hospital stems, at least in part, from an assumption that appears to permeate the discussion of exigency in *Mitchell*. At the outset of the plurality opinion, Justice Alito posits what he considers a paradigmatic situation where "police officers most frequently come upon unconscious drivers when they report to the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant." (*Mitchell, supra*, 588 U.S. at pp. 843–844.) This hypothetical

10

scenario underlies much of the exigency discussion in the opinion. It portrays harried officers conducting "triage" at an accident scene, balancing a host of "rival priorities" that will be all the more impossible if they are required to obtain a blood draw warrant. (*Id.* at p. 856.) According to the opinion, "[t]his is just the kind of scenario for which the exigency rule was born—just the kind of grim dilemma it lives to dissolve," and justifies the "general rule" that "when a driver is unconscious, … a warrant is not needed." (*Id.* at p. 856; see *id.* at p. 844.) But when the suspect-driver falls unconscious sometime later, away from the scene, exigency is not so apparent.

Indeed, neither this case nor *Alvarez* fits the *Mitchell* paradigm. In *Alvarez*, although Officer Yost initially spent some time at the accident scene, it was only after he finished his responsibilities there that he drove to the hospital to contact the defendant. In this case, Officer Pope was *never at the scene of the collision.* Whatever "urgent tasks" and "pressing matters" confronted officers and emergency personnel at those locations, they were not a concern for Officers Yost and Pope at the point in time they decided to request a blood draw.

*Mitchell* itself acknowledges there may be situations where a blood draw warrant for an unresponsive suspect-driver is required because "police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties." (*Michell, supra*, 588 U.S. at p. 857.) In *Alvarez*, we located nothing in the record to support a conclusion that a delay in getting a warrant would have diverted Officer Yost from any aspect of his investigation. (*Alvarez, supra*, 98 Cal.App.5th at p. 545.) We reach a similar conclusion here.

In terms of how seeking a warrant might have interfered with other responsibilities, we agree with the People that the critical period of time is

11

from 3:45 a.m., when Officer Pope decided to arrest Castro, and 4:25 a.m., when Castro's blood was drawn. At 3:45 a.m., Pope was not at the scene of the collision, where *Mitchell* teaches he might have been distracted by other accident-related tasks. He was at the hospital, where he had been the entire evening, and the prosecution offered no evidence as to what Pope was doing during this time period.[5] In response to a general inquiry by defense counsel, Pope claimed he could not remember what he was doing. When counsel tried to ask him whether he was working on other assignments or investigations, the prosecutor successfully objected that the question was irrelevant.

The Attorney General seeks to distinguish *Alvarez* "because [Castro] was transported to the hospital for injuries and sedated from the moment Officer Pope first tried to contact him," whereas the defendant in *Alvarez* spoke to law enforcement and was administered field sobriety tests before becoming unconscious. But these are distinctions without a difference and played no role in our *Alvarez* analysis with regard to whether obtaining a warrant would have diverted the officer from other more pressing duties. In *Alvarez*, we found it significant that Officer Yost " 'was[n't] thinking [he] should get a warrant.' " (98 Cal.App.5th at p. 545.) Similarly here, Pope simply did not believe he needed to obtain a warrant for an unconscious suspect-driver. In neither case was the officer balancing the time it would take to get a warrant against other pressing investigatory duties.

---

[5] The Attorney General asks us to assume that "[a]t a minimum, securing a warrant would have required Officer Pope—the only investigating officer—to pause his DUI investigation." We cannot indulge this assumption absent *some* evidence showing that he was actually performing investigative tasks while he waited for the blood draw. So far as this record shows, Pope had completed his investigation with the exception of obtaining an evidentiary blood sample.

Ultimately, *Mitchell*'s references to "rival priorities," "more pressing needs," and "other pressing duties" of police officers (588 U.S. at p. 856; see *id.* at pp. 840, 851), must be understood in the context of the opinion's focus on an officer responding to the natural chaos that pervades the scene of automobile accident. And this focus helps explain the flaw in the magistrate's reasoning when she suggested that a finding of exigency could be based on the fact that "[e]very minute that Officer Pope was there [at the hospital], he was not out on the freeways." Accepting that theory, the exigency exception would swallow the warrant rule because the time an officer spends obtaining a warrant could always be used for other police duties. Yet we must remember that obtaining warrants before conducting searches and seizures *is a crucial part* of a police officer's duties, not a distraction from them, and *Mitchell* does not suggest otherwise. Rather, *Mitchell* only observes that traffic accidents, by their very nature, often create competing demands on an officer's time, which will be especially relevant in establishing exigent circumstances.

Consistent with *Alvarez*, we conclude that the record in this case fails to support the trial court's finding of exigency so as to excuse the failure to obtain a warrant. (98 Cal.App.5th at p. 546.)

## DISPOSITION

The judgment is reversed.  The matter is remanded to the superior court with instructions to (1) vacate the order denying Castro's suppression motion and enter a new order granting it; (2) permit Castro to withdraw his guilty plea by appropriate motion within 30 days after this opinion becomes final; and (3) if he does so, determine whether the People intend to retry the case.


DATO, Acting P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.

14